CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 1 0 2007

JOHN F. CORCORAN, CLERK
BY: /s/
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LAQUILLA HAMMOND,<br><br>    Plaintiff,<br><br>v.<br><br>LINDA S. McMACHON,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>    Defendant. | Civil Action No. 7:06cv00535<br><br>By:  Hon. Michael F. Urbanski<br>      United States Magistrate Judge |

## MEMORANDUM OPINION

Plaintiff LaQuilla Hammond ("Hammond") filed this action challenging the final decision of the Acting Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. Jurisdiction is based upon 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge, see 28 U.S.C. § 636(c)(2), and the case is before the court on cross motions for summary judgment. Having reviewed the record, and after briefing and oral argument, the court concludes that substantial evidence supports the Commissioner's determination that Hammond was not disabled as of the last date insured and, therefore, is not entitled to DIB benefits. Accordingly, the Administrative Law Judge's ("ALJ") decision must be affirmed.

I.

Hammond was born in 1973, she has an eleventh grade education, and she has a GED. (Administrative Record [hereinafter R.] at 136) From 1997 to 2003, Hammond was employed by various employers doing temporary work. (R. 121) Hammond most recently worked for CEI

Elizabeth Arden, through a temporary employment agency, packing and assembling boxes. (R. 111) Hammond also previously worked as a waitress, cook, salesperson, and housekeeper in assisted living, and she has also done temporary filing and copying work. (R. 68-85, 111, 313-14) The parties agree that the last day on which Hammond was insured for purposes of DIB was March 31, 2004; thus, to be eligible for benefits she must prove she was disabled as of that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a); Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005).

Hammond filed an application for benefits on or about August 4, 2004, alleging that she became disabled on March 31, 2004, due to depression, anxiety, and other severe emotional problems. (R. 61, 121) The claim was denied initially and on reconsideration, and a request for rehearing was filed. (R. 43) The rehearing was held on August 26, 2005, (R. 16-24), and on March 21, 2006, the ALJ issued a written opinion denying Hammond's claim for benefits. (R. 12-26) Specifically, the ALJ found that Hammond has the functional capacity to do medium work,[1] but that she has mildly reduced use of her left hand which limits her ability to do repetitive work or fine manipulation with that hand. (R. 21) Hammond submitted additional evidence, and she requested subsequent review by the Appeals Council on March 29, 2006. (R. 8-9, 263-69) The Appeals Council found no basis to change the ALJ's decision and denied Hammond's request for review. (R. 5-6) Accordingly, the ALJ's decision became final pursuant to 20 C.F.R. § 404.981, for purpose of judicial review under 42 U.S.C. § 405(g).

---

1 "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

2

## II.

Hammond argues that the ALJ erred in finding that she retained the residual functional capacity ("RFC") to do a range of medium work. Accordingly, she asks that the Commissioner's decision be reversed.

Judicial review of a final decision regarding disability benefits under the Act is limited to determining whether the ALJ's findings "are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing 42 U.S.C. § 405(g)). Accordingly, the reviewing court may not substitute its judgment for that of the ALJ, but instead must defer to the ALJ's determinations if they are supported by substantial evidence. Id. Substantial evidence is such relevant evidence which, when considering the record as a whole, might be deemed adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays, 907 F.2d at 1456; Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

## III.

Hammond argues that the ALJ erred in evaluating the severity of her mental impairments. The ALJ determined that although Hammond suffered from severe mental health problems including depression, affective disorder with psychotic features, anxiety, panic attacks, and post-traumatic stress disorder ("PTSD"), as of the date last insured, her testimony regarding the intensity, duration, and limiting effects of these problems was not entirely credible. (R. 22) The ALJ concluded Hammond has moderate limitations due to depression and anxiety, as well as

3

moderate reduction in concentration, and she would need a non-complex, low-stress job that involved little contact with the public. (R. 314)

Hammond testified that she stopped working in February 2004 because she could no longer deal with the stress of working, and she ultimately left her job in tears, unable to return. (R. 287) Additionally, she testified the same thing occurred at her previous jobs. (R. 287-88) She continued that she has never held a job for a long period of time, and at most, was employed six to eight months. Hammond stated that she is not a reliable employee because she has many unexplained absences. (R. 291)

The ALJ considered Hammond's testimony as well as the record as a whole in determining that her statements of disabling problems in 2004 were not wholly credible and that as of the date last insured she retained the RFC to do some medium work. (R. 14-26) In light of conflicting evidence in the record, it is the duty of the ALJ to fact-find and resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Accordingly, the ALJ is not required to accept Hammond's subjective allegation that she was disabled by emotional problems as of March 31, 2004, but rather must determine, through an examination of the objective medical record, whether she has proven an underlying impairment that could have been reasonably expected to produce the symptoms alleged. Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996). Then, the ALJ must determine whether Hammond's statements about her symptoms are credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989).

The medical records establish that prior to March 31, 2004, Hammond complained just once of emotional disturbance. (R. 238) On January 8, 2003, Hammond's physician at Kuumba Community Health and Wellness Center, Dr. Scott Hanson, noted her tearfulness and lack of drive, and he referred her to Blue Ridge Behavior Health Care Services ("BRBH"). (R. 239) There is no evidence that Hammond went to BRBH or sought any other mental health treatment. (R. 171)

The next mention of any mental health problems in Hammond's medical record was more than a year later and after the date last insured. On April 27, 2004, Dr. Hanson saw Hammond again and indicated in his clinical notes that Hammond complained of nervousness, sleep problems, and stress. Dr. Hanson prescribed fluoxetine[2] for her depression, and he again referred her to BRBH, but once again she did not follow through with any counseling. (R. 262)

On May 3, 2004, Hammond returned to Kuumba for a mental health screening with Katrina Mabery, BSW.[3] In the interview, Hammond stated that she had been depressed since 1996 or 1997, and she felt sad, lonely, tired, angry, and unmotivated. She also stated that she did not like being around people, and she described occasional panic attacks. She indicated that she had been unemployed for two months, but that she was currently seeking employment. Mabery recommended counseling. (R. 267-68)

On May 27, 2004, Hammond returned to Kuumba for a follow-up appointment with Dr. Hanson. Hammond complained of dizziness and passing out, though she reported improvements

---

2 Fluoxetine (Prozac) is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. It is in a class of medications called selective serotonin reuptake inhibitors ("SSRI"s), and it works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html.

3 Bachelor's degree in Social Work

in her temper management. Dr. Hanson diagnosed Hammond with depression and panic disorder, and he recommended that she continue on fluoxetine. (R. 194-95)

Hammond did not seek any further treatment for nearly ten months. On March 10, 2005, she saw Dr. Hanson, who noted that Hammond was tearful and reported feeling hopeless, but not suicidal. During her exam, Hammond advised Dr. Hanson that she found the fluoxetine somewhat helpful, but her prescription ran out several months earlier. Dr. Hanson prescribed fluoxetine again. (R. 234-35) Hammond returned to Dr. Hanson's office eight days later for urinary tract problems, and at that time she reported no new complaints and denied suicidal or homicidal ideation. (R. 236-37)

On April 25, 2005, Hammond returned to Dr. Hanson and reported feeling stressed out and "sick of life." He increased her fluoxetine prescription from 20 mg to 40 mg and set up an immediate appointment with a Licensed Clinical Social Worker ("LCSW"). (R. 228-29) Hammond followed up with Dr. Hanson on May 9, 2005, and she reported that she did not feel better and had missed several appointments with the LCSW. Dr. Hanson noted Hammond's continuing depression and non-compliance regarding counseling. (R. 230-31).

Dr. Hanson next saw Hammond on July 25, 2005. During her exam, despite professing to be taking her prescribed anti-depressant, Hammond appeared tearful and stated that she felt as if she were drowning. Dr. Hanson noted that Hammond was anxious and her safety needed assessment, but that she denied suicidal ideation. He changed Hammond's prescription from fluoxetine to Symbyax.[4] (R. 224-25).

---

4 Symbyax contains both fluoxetine and olanzapine, and it is used primarily to treat depression caused by bipolar disorder. Olanzapine is an antipsychotic. http://www.drugs.com/symbyax.html

On August 17, Hammond reported she was improving on Symbyax and was less tearful. Dr. Hanson recommended that she continue on Symbyax and with counseling. Likewise, when she returned for a follow-up exam in September, Hammond reported she continued to feel more emotionally stable.

While Dr. Hanson's records indicate that Hammond attended some counseling sessions from May 2004 to September 2005, and Hammond corroborated this in her Disability Report, Hammond did not submit records of these sessions. (R. 123, 235, 266-68) In the Disability Report, Hammond stated that she was counseled by "Ann" at Kuumba in May 2004 following the initial screening conducted by Katrina Mabery. (R. 123, 266-68) Additionally, Dr. Hanson's notes reveal that Hammond was scheduled to see the LCSW on April 28, 2005 and Dr. Perkins on May 20, 2005, but there is no confirmation in the record that Hammond attended these meetings. (R. 228) There are no other indications in the record of the dates or frequency of other counseling sessions that Hammond may have attended.

Nothing in the medical record suggests that Hammond had any disabling mental impairment as of the date last insured. She complained once of depression in early 2003, and she did not seek counseling as Dr. Hanson prescribed. Hammond did not complain of depression again until well over a year later, past the date last insured, and, again, she did not comply with Dr. Hanson's instruction for counseling.

As Hammond's primary physician for both her physical and mental health problems, Dr. Hanson has an established relationship with Hammond and has had the opportunity to monitor her well-being over a prolonged period. He never indicated that Hammond was disabled, incapable of employment, or limited in mental capacity. Rather, the records reflect that Dr.

7

Hanson believed Hammond's mental health issues are treatable with medication and counseling. Likewise, Hammond's mental health screener, Ms. Mabery, did not indicate that Hammond is disabled or of limited capacity due to her mental condition, and she advised Hammond to seek counseling. Further, the records reflect that Hammond's depression and anxiety did indeed improve with medication, when she took it as prescribed, and in 2005, when Hammond finally did participate in counseling, her mental condition further improved.

In contrast to Dr. Hanson's medical records and Ms. Mabery's screening notes, Dr. Belinda Overstreet, who performed a consultive examination of Hammond on November 8, 2004, opined that Hammond had significant limitations on her ability to work. (R. 140) Dr. Overstreet reviewed Hammond's medical records from Kuumba from January 2003 and May 2004, which indicated diagnoses of depression and panic disorder, as well as comments about anger management. (R. 140) Other than these records, Dr. Overstreet's conclusions were based solely on her direct observations of Hammond and Hammond's subjective account of her symptoms.

Hammond reported to Dr. Overstreet that she feels angry, sad, and lonely most of the time, and that she has trouble sleeping, loss of appetite, low energy, and difficulty concentrating. She reported suicidal ideation with a plan, violent thoughts, panic attacks, nightmares, irritability, voices in her head, prior alcohol abuse, and current marijuana use. She stated that she has difficulty interacting with others, she is often suspicious, she does not drive, and she rarely leaves her home. Nonetheless, Hammond also reported to Dr. Overstreet that she showers and wears clean clothes daily, and that she has no trouble managing her household, including cooking for

8

her family, caring for both her and her children's personal needs, and managing her finances. (R. 137-38)

Dr. Overstreet observed that Hammond was tearful throughout the interview, engaged in hand-wringing, had a tense posture, and appeared anxious and depressed. (R. 137, 139) Dr. Overstreet also observed that Hammond was neatly groomed, was cooperative, maintained eye-contact, spoke clearly and normally, thought logically, and was attentive and alert. (R. 139) Dr. Overstreet found that Hammond was oriented and attentive, though her concentration was somewhat impaired. She also noted some impairment of Hammond's long term memory, though not her short term memory. Dr. Overstreet concluded that Hammond could understand, remember and carry out simple instructions, and she was capable of making simple decisions and understanding rules. Dr. Overstreet assessed Hammond with a Global Assessment of Functioning ("GAF") score of 45, indicating serious symptoms.[5] Dr. Overstreet also opined that although Hammond's prognosis related to mood and anxiety disorder was poor, she believed this would improve with treatment. (R. 139-40)

Regarding employment, Dr. Overstreet opined that Hammond's poor motivation might make it difficult for her to work independently; she is likely to have difficulty working with others, with the public and with being supervised; and the stressors of a work environment may exacerbate her psychiatric symptoms. Dr. Overstreet also found Hammond is likely to be absent or tardy frequently. (R. 140)

---

5 The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic And Statistical Manual Of Mental Disorders Fourth Edition 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates than an individual has "[s]erious symptoms . . . OR serious difficulty in social, occupational or school functioning . . ." Id.

On November 10, 2004, two days after Hammond met with Dr. Overstreet, William Humphries, M.D., a state agency physician, examined Hammond and completed an independent report. Dr. Humphries noted that Hammond had a flat affect and a history of anxiety and depression, but he made no other notes regarding symptoms or limitations due to her alleged mental health problems. He opined that her thought and idea content, memory for recent and remote events, and her intelligence were all in the low normal range. (R. 148-51)

In December 2004, R.J. Milan, Jr., Ph.D., a psychologist, reviewed Hammond's records and compiled an RFC assessment. (R. 27, 152-172) In that evaluation, although he expressly noted Overstreet's evaluation of Hammond's functionality, he gave the opinion less weight because of its inconsistency with the totality of the evidence. (R. 171) Dr. Milan concluded Hammond's medical records establish that she suffers from depression, PTSD, and panic disorder, and that she has moderate limitations in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to maintain persistence and pace, to perform activities within a schedule, to maintain regular attendance and be punctual, to sustain a routine, to work with others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to interact appropriately with the general public. (R. 162, 169-171) Despite her mental impairments, Dr. Milan concluded that Hammond has adequate cognitive processes and judgment, and she is able to meet the basic mental demands of competitive work on a sustained basis. (R. 171-72) Additionally, he found that her activities of daily living are only mildly impacted by her mental impairments, but her ability to function socially is moderately impacted. (R. 162) E. Hugh Tenison, Ph.D., also a psychologist, reviewed

Dr. Milan's assessment in February 2005, and he certified Dr. Milan's evaluation without any changes. (R. 28, 152, 172)

The medical record as a whole does not indicate that Hammond was totally disabled from all substantial gainful activity as of March 31, 2004. Hammond's primary physician has not indicated she is mentally unable to work nor has he suggested that she in any way limit her activities. Although Hammond's medical records establish that she began complaining of symptoms associated with depression in January 2003, it is clear these symptoms were not wholly disabling as of the date last insured. Hammond did not make any additional complaints of mental discomfort until more than a year later, and even then she refused to comply with recommended treatment. Further, the record establishes it was not until April 2004, after the date last insured, that Hammond's mental condition deteriorated to the point she was willing to comply with treatment. Even then, her treatment records do not indicate she was or is disabled from all forms of work due to these problems, as she went nearly eight months without seeing a physician, she did not attend counseling sessions consistently, she smoked marijuana on a regular basis, and she let her antidepressant prescription lapse. Further, there are several indications in the medical record that despite her difficulties Hammond's activities of daily living were not hampered. For instance, she continued to care for her children and manage her home, she regularly walked her children to and from school, she helped them with homework, and she cooked, cleaned, grocery shopped, and managed household finances. (R. 138, 268)

Hammond argues that the ALJ did not afford proper weight to the opinion of Dr. Overstreet in determining she retained the RFC to do some range of medium work. Opinions that a claimant is "unable to work" are not entitled to controlling weight because such decisions

11

are reserved for the Commissioner. 20 C.F.R. § 404.1527 (e)(1) (stating a medical expert's opinion as to the ultimate conclusion of disability is not dispositive). Moreover, as noted above, such a finding in this case is inconsistent with the record as a whole and, thus, Dr. Overstreet's opinion is not entitled to great weight. See Craig v. Chater 76 F.3d 585, 590 (4th Cir. 1996) (holding an ALJ may assign little or no weight to an opinion if it is not supported by objective testing or the record as a whole).

Dr. Overstreet's opinion that Hammond is unlikely to be able to work is particularly suspect as she saw Hammond on only one occasion and reviewed only a small portion of her medical records. As noted by the ALJ, Hammond's treating physician recommended conservative treatment and did not indicate she is unable to sustain work due to her mental impairments. (R. 23) Likewise, the social worker who administrated Hammond's mental health screening in May 2004 recommended conservative treatment. (R. 268) Additionally, Drs. Milan and Tenison agreed that Hammond was able to work and did not have limitations qualifying her for disability. (R. 27-28) Thus, the ALJ properly accorded Dr. Overstreet's opinion little weight.

The ALJ did not discount Hammond's testimony that she had been and was currently experiencing problems with depression, panic attacks, and social anxiety. However, the ALJ found that her testimony regarding the extent of her limitations as of March 31, 2004, the date last insured, were not credible based on her medical record and her admitted functional abilities. (R. 14-26) Considering the entire record, especially the information contained in Hammond's medical record and Dr. Milan's functional assessment, the court finds no reason to disturb the ALJ's credibility determination. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the

12

credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). Further, based on a complete review of Hammond's medical history and her admitted functional abilities on her disability application and mental health screening at Kuumba, the court finds there is substantial evidence to support the ALJ's determination that as of March 31, 2004, the date last insured, Hammond retained the capacity for a range of medium work. See Wagner v. Apfel, No. 98-2260, 1999 WL 1037573, at *5 (4th Cir. Nov. 16, 1999) (upholding finding of no disability where plaintiff testified that he suffered from severe mental illness, but the ALJ accorded his testimony less weight after determining his testimony was not credible); McGuiness v. Apfel, No. 97-2037, 1998 WL 276276, at *1 (4th Cir. May 29, 1998) (upholding a finding of no disability for mental or physical health problems where plaintiff's daily activities included going to doctors and grocery shopping, housework and washing dishes).

## IV.

Hammond argued at oral argument that the moderate limitations determined by Dr. Milan were not included in the hypothetical considered by the vocational expert ("VE"), Robert Jackson. (R. 314) However, the transcript from the August 26, 2005 hearing reveals that Hammond's limitations were sufficiently considered by the VE, and a more detailed account of these limitations would not have materially altered his conclusions.

At this step of the disability determination, the Commissioner bears the burden of establishing that Hammond can engage in employment that exists in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(1-2). In determining whether the Commissioner met this burden, the ALJ shall generally accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies that there are jobs for such a

13

person in the national economy. See 20 C.F.R. § 404.1520(g)(1), Morgan v. Barnhart, 142 Fed. Appx. 716, 720-21 (4th Cir. 2005).

The ALJ's hypothetical was appropriate in that it fairly set out Hammond's general impairments. See Walker v. Bowen, 889 F.2d, 47, 50 (4th Cir. 1989). In posing her question to the VE, the ALJ referred to Hammond's depression, anxiety, and concentration limitations, her RFC to do medium exertional work, and that she could only do non-complex, low-stress tasks. (R. 314) In response, the VE opined that housekeeping or cleaning work would be suitable and that in Virginia there are over 4,000 positions. (R. 314-15)

While the ALJ did not give Jackson an exhaustive list of the impairments identified by Dr. Milan, "the ALJ has some discretion to craft hypothetical questions to communicate to the vocational expert what the claimant can and cannot do. . . it is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." Fisher v. Barnhart, 181 Fed. Appx. 359, 364 (4th Cir. 2006). Moreover, the VE evidently understood the extent of Hammond's limitations because the jobs he identified in response to the hypothetical question do not require a worker to perform mentally complex tasks, work with the public, or perform in stressful situations. See id. Thus, the ALJ's hypothetical question fairly conveyed Hammond's functional capacity to the expert.

Because the ALJ's RFC determination is supported by substantial evidence and because the challenged hypothetical question incorporated that determination, the court finds the ALJ presented appropriate hypotheticals sufficiently encompassing all of Hammond's functional limitations to the VE.

## V.

For the reasons stated above, the court affirms the final decision of the Commissioner and grants the defendant's motion for summary judgment.

In affirming the final decision of the Commissioner, the court does not suggest that Hammond is totally free of all mental health problems and subjective discomfort. However, the objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability for all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating plaintiff's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Defendant's motion for summary judgment must be granted.

The Clerk of the Court is hereby directed to send a certified copy of the Memorandum Opinion and accompanying Order to all counsel of record.

ENTER: This 9th day of August, 2007.

/s/ Michael F. Urbanski
Michael F. Urbanski
United States Magistrate Judge